## McCahan's Appeal.

Guardian lending himself to fraudulent acts of administrator, by which it was sought to charge his ward with depreciated bank stock, which the administrator, when it was selling at a premium, had intended to retain for his own use at the *par* value, not allowed any compensation.

And interest charged in such case up to the day of decree.—Per Grier, P. J

Administrator settled an account, charging himself with certain bank stock, held by his intestate, at *par*, which he declared he held for the estate, the stock then selling for a premium. The executor of the administrator settled another account charging

himself with the balance of the former account as cash; and while the stock was at a great premium transferred it to C., and two days afterwards took a retransfer in his own name. The stock having become worthless, the son of the executor was appointed guardian, and gave a receipt to the administrator for the stock in full for his ward's estate; but no transfer was made, and he acted entirely under the control of his father. The guardian is not entitled to a credit for the depreciation of the stock.

FROM the Orphans' Court of Indiana.

*Oct.* 16. The two questions argued on this appeal were, whether the accountant was entitled to a credit for the depreciation of certain stocks, and whether he was entitled to compensation as guardian. The case, as presented on the paper book, was as follows: John Denniston died in 1829, leaving eight children. In 1830, James McCahan, his administrator, filed his account, charging himself with a balance of $19,141, and died, having appointed John McCahan his executor. Among the items of charge in this account, were forty shares United States Bank stock, $4000; one hundred and twenty shares Harrisburg Bank, $3000; twenty shares Pittsburgh Bank, $1000. To this amount was appended a note, "The two first of these stocks are at a considerable premium, and the last at a low premium; but the accountant charges himself with the original value, as he is ready to transfer the stock to any guardian of the junior children, and holds the stock for the benefit of the estate." John, as executor of James, filed a final account of the estate of Denniston on the 7th August, 1838, charging himself with the balance of the first account as cash. This account showed a balance of $28,374, and was confirmed by the court. Until the 28th June, 1838, there had been no guardian appointed for the minor children of Denniston; but on that day, James A. McCahan, (the present accountant,) a son of John McCahan, was appointed guardian of the four younger children, John having previously acted as administrator of Denniston and guardian of the children, and having paid large sums of money on their account, under direction of the Orphans' Court. In the present account James A., the guardian, claimed a credit for the $4000 in United States Bank stock, "originally purchased by Denniston, and transferred as a fund for the support of the minor children by his representatives."

On reference to an auditor, it was proved that Denniston purchased this stock in 1826, and it remained in his name until May 16, 1839, when John McCahan, executor of James, transferred it to C. Cope. On the 18th of the same month the same shares were retransferred by Cope to John McCahan in his own name. It was

also shown that in September, 1838, shares were quoted at 123 *a* 123½, the *par* value being $100. On the 16th May, 1839, the quotations were 118. About the middle of 1839, shares were below *par*, and have so continued, being now 4 *a* 5. Before the auditor the exceptants required the accountant to be examined, touching a receipt hereinafter mentioned, and the circumstances connected therewith; they also took out a subpœna, to compel John McCahan to appear and be examined. But the accountant refused to answer, and the witness would not attend. On the report coming in, attachments issued—when the receipt was produced, and the accountant consented to be examined. The receipt was without date, as follows:

" Received, as guardian of the minor children of the late John Denniston of Indiana, deceased, of John McCahan, executor of the estate of James McCahan, deceased, $4000 in stock of the United States Bank; $3000 in stock of the Harrisburg Bank; $1000 in stock of the Pittsburgh Bank, and Dorsey & Green's note for $10,195 78, subject to interest in full of the balance due to the respective heirs of the aforesaid John Denniston, deceased, for whom I hold the appointment of guardian.

"JAMES A. McCAHAN."

" Witness present, M. BOWY.

" $18,196 78."

This was produced by the accountant, who on his examination stated as follows:—

" I have no recollection—I do not know at what time the receipt was given; it was about the time the United States Bank stock was going down—it was not in very good credit at the time—I think it is more than likely it was about the start of its declension."

Cross-examined.—" At the time of the receipt I did not receive the stock mentioned or the evidences of the stock. John McCahan is my father—he said it was for the purpose of testing the old heirs whether they felt like holding uncle's children for that Bank stock—I never received any thing—bonds, notes, nor papers, nor any thing else—nor moneys nor any thing else—my father had the management of the funds, and Judge McKennan had the management of the persons of the wards. I always understood it was a mutual understanding among all the persons that it should be in that way. I never did any act unless it was directed by my father."

His honour, GRIER, P. J., holding a special court, after giving an outline of the evidence and the note appended to James McCahan's account, said:—" But in the account filed by John

McCahan in 1838, he charges himself with *the balance of the first account as cash ;* and although he made large payments to *some of the heirs,* he turned over *none of these stocks to them at par or any other value ;* at *that* time the United States Bank stock was at $123 for $100, or 23 per cent. above *par.* On the contrary, on the 16th May, 1839, when the United States Bank stock was still 18 *per cent.* above *par, he assigns these forty shares to Caleb Cope, who, two days after, assigns the certificate to* John McCahan.

"Not long after this, United States Bank stock began to decline rapidly; and as they were verging rapidly down to zero, if they had not already reached that point, John McCahan, finding that this $8000 worth of stocks, which were worth near $10,000 when he charged himself with them at their *par* value, would probably *suit the minor children of John Denniston, better than himself,* takes from his son, James McCahan, the following receipt, without date."

His honour here stated the receipt and the examination of the accountant :—

"After this singular development of facts, wrung at last from this unwilling witness, there can be no doubt as to what conclusion our minds should arrive at on the two main points of dispute in this case. Without using any harsh epithets to characterize this proceeding, as it deserves, it is sufficient to say that to cast the loss of this $4000 on these forty shares of United States Bank stock, upon these orphans, would be an outrage upon justice. *John McCahan* is in fact the person really interested, and *rendering this account* in the *name of his son James,* whose name has been used only to cover up a transaction not very creditable to either.

"Compensation is allowed to a guardian for *the performance of his duties,* not *for a total disregard of them.* By the accountant's own confession, he has never acted in good faith toward his wards, or done any thing to protect their interests. On the contrary, he has permitted himself to be used as the instrument of John in a palpable endeavour to wrong them. He is therefore entitled to *no allowance* for compensation.

"If we were to take the amount of this receipt, $18,195 18 and add thereto the previous payments to each ward, with interest up to the time of settling the administration account, amounting to . . . . . $4823 62

And divide this by four, the number of wards . . 23,018 80
The amount due each of the four wards would be . 5754 70

And deduct from this the payments previously made
to Martha, (one of the wards,) together with interest    $1453 30

This would be the amount for which Martha might in
strictness hold her guardian to account  .   .   .    4301 40
And Sarah for the sum of        .   .   .   .   .    4649 47

"But as the counsel for the wards has not demanded so sharp an
account, we are content to adopt his statement, as calculated, on
correct principles, to show the real amount due to each of the
heirs.  For as some of the older heirs received their shares many
years ago, and unequal sums have been paid to the others, the divi-
ding of the balance appearing on the administration account equally
among the heirs, would give false data to commence with, and give
one heir more than his share, and another less.

"When the interest of the money in the guardian's hands is
sufficient to support his ward, it should be so applied, and the pay-
ments not deducted from the principal.  But when payments
have to be made for the ward before his money can raise him an
income from the interest, the guardian should be allowed to have a
sufficient sum in hand, clear of interest, to meet probable expenses."

His honour then stated an account, charging accountant with the
amount he should have received for one of his wards, 28th Septem-
ber, 1838, $3420, (as appeared from a schedule not on the paper
book.)  He allowed $220 to be retained for current expenses, as
those exceeded the interest.   On the balance, interest was charged
until the date of a large payment to the ward's husband, deducting
expenses of maintenance; on the balance, interest was charged
until the date of the decree of the court below.

The same principle was adopted as to the second ward's share,
excepting that nothing was deducted to meet current expenses, they
not equalling the interest.

His honour then said :—"If a sharp interest account had been
settled with John McCahan; if he had been charged with the ad-
vanced value of the stocks, as he in strict justice *might have been*—
or even if we had charged the accountant with the *face* of his re-
ceipt without date, and rectified the balance due each ward upon
*that* as a basis, a larger balance would have been struck against
the accountant.   But as the husbands of the wards and their
learned counsel have not demanded so *stringent* an account, we
have concluded to state it as above, being the most favourable
which the accountant could in reason hope or expect.   If not con-

tent with this, to use a homely proverb, he may 'go further and fare worse.'"

*Drum*, for appellant.—In respect to the charge of bank stock against appellant, the first question to be considered is, whether the stocks remained *in specie* in the hands of Denniston's administrator. James McCahan, the administrator of John Denniston, in his account, charges himself with the *par* value of the stocks, it is true, but at the same time expressly says that he holds the stocks, and they remain in his hands "*for the benefit of the estate.*" At his death the certificates remained in his hands. All right to them at that moment vested in the administrator *de bonis non*, who succeeded him, and could and ought to have sued for their possession: Commonwealth *v.* Strohecker, 9 Watts, 479; Drenkle *v.* Sharman, 9 Watts, 495; Kendall *v.* Lee, 2 Penna. Rep. 482. John McCahan, executor of James McCahan, had no power whatever over the stocks, and any disposition of them by him was a mere nullity. His transaction with the bank, then, even if made with the intention of vesting the ownership in himself, amounts to nothing. The same rule applies to the receipt given by appellant to John McCahan for the stocks in question. He, having no power over them, clearly had no right to transfer them to the guardian; and even if the latter had actually received them, the transaction would have been void. But the evidence shows that no part of the stocks in question actually came into his hands. The receipt given had not, and was not intended to have any operation upon the title to the property. Neither can appellant be made liable, under the evidence, for not pursuing and recovering the value of the stocks. He is only responsible for supine negligence, such as does not appear here: 5 Whart. 472; 11 Serg. & Rawle, 66; 1 Penna. Rep. 214.

*Banks* and *Stewart*, contrâ.—The guardian was bound to pursue and secure the balance due to his ward in the hands of the administrator; and not having done so, he is chargeable therewith: Long's Estate, 6 Watts, 46. It is said they were never administered by the first administrator, but the introduction into the account was sufficient for that purpose: 1 Penna. Rep. 185; 2 Watts, 161, 164; 2 Barr, 432, 434. But the transaction, if real, was in fact a purchase of depreciated stocks by the guardian from his father, in satisfaction of a debt due by him as administrator; he is therefore clearly liable in such case: Luken's Appeal, 7 Watts & Serg. 48; 5 Watts & Serg. 254, 258. The amount due by the administrator

F

is definitively settled by the decree of confirmation: 2 Rawle, 304; Downing's Estate, 5 Watts, 90; 17 Serg. & Rawle, 336, 341: 8 Watts, 181. The Orphans' Court may decree distribution: 17 Serg. & Rawle, 31.

That he has forfeited his compensation is most plain. He lent himself to an attempt on the part of his father, who had intended to defraud the estate out of the premium of the bank stock—to return it when worthless at the original value: 4 Watts, 77, 79.

*Nov.* 1. COULTER, J.—The decree of the court below is affirmed, for the full and satisfactory reasons given by the learned judge, who presided at the special court, and whose opinion was filed, and comes up with the record, and will be reported.

Decree affirmed.